**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| HENRY MCMASTER, in his official capacity as Governor of South Carolina, *et al.*,<br><br>Plaintiffs,<br>v.<br>UNITED STATES DEPARTMENT OF LABOR, *et al.*,<br><br>Defendants. | Case No. 3:22-cv-2603-SAL |
| HENRY MCMASTER, in his official capacity as Governor of South Carolina, *et al.*,<br><br>Plaintiffs,<br>v.<br>UNITED STATES DEPARTMENT OF LABOR, *et al.*,<br><br>Defendants. | Case No. 3:23-cv-1038-SAL |

## DEFENDANTS' COMBINED REPLY MEMORNDUM IN SUPPORT OF THEIR MOTION TO DISMISS IN "*MCMASTER II*" AND MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 60(B) MOTION IN "*MCMASTER I*"

This combined memorandum serves as both a reply brief in support of Defendants' motion to dismiss in *McMaster v. U.S. Dep't of Labor*, No. 3:23-cv-SAL (D.S.C. Aug. 30, 2024) ("*McMaster II*"), ECF No. 35 ("MTD"), and a brief in opposition to Plaintiffs' Rule 60(b) motion in *McMaster v. U.S. Dep't of Labor*, No. 3:22-cv-2603-SAL (D.S.C. Sep. 20, 2024) ("*McMaster I*"), ECF No. 59 ("R. 60(b) Mot.").

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 5

ARGUMENT ....................................................................................................... 7

I. THE COURT SHOULD GRANT DEFENDANTS' MOTION TO DISMISS *McMASTER II*. ............... 7

    A. Plaintiffs' APA Claims (Counts IV and VI) Are Untimely. ................................. 7

        1. Plaintiffs' APA claims accrued more than six years before they brought suit. 7

        2. Plaintiffs' claims should not be equitably tolled. ........................................ 9

            a) Plaintiffs' "defective complaint" theory fails. ................................. 9

        3. Plaintiffs were not "induced," "tricked," or "lulled." ............................... 11

    B. Plaintiffs' Declaratory-Relief Claims (Counts I–III) Should Be Dismissed. ....... 12

        1. These claims are barred by *Thunder Basin*. ............................................. 12

            a) There is a "fairly discernible intent" in the OSH Act to preclude district-court jurisdiction. ................................................................ 12

            b) Plaintiffs' claims are "of the type" that Congress meant to await *post hoc* review ........................................................................... 13

            c) Meaningful review. ........................................................................ 15

            d) Collaterality. ................................................................................. 17

            e) Agency expertise. ......................................................................... 18

        2. Counts I–III are not "actionable under the APA." ................................... 19

    C. The Claim from *McMaster I* (Count VII) Should Be Dismissed .......................... 20

II. THE COURT SHOULD DENY PLAINTIFFS' RULE 60(B) MOTION IN *McMASTER I* BECAUSE THEIR PROPOSED AMENDED COMPLAINT WOULD BE FUTILE. ............................................ 21

**INTRODUCTION**

This case centers on a regulation promulgated by the Occupational Safety and Health Administration ("OSHA") to help implement the Occupational Safety and Health Act of 1970 ("OSH Act"). Under the OSH Act, any State or Territory that wishes to administer its own plan for workplace health and safety must enforce its standards "at least as effective[ly]" as OSHA does. 29 U.S.C. § 667(c)(2). The Secretary of Labor was granted authority to promulgate regulations in aid of his responsibilities under the OSH Act—which include evaluating whether a proposed State plan satisfies the criteria in § 667(c). *See id.* §§ 657(g)(2), 667(c).

So, in 1971, OSHA elaborated on what "at least as effective" enforcement means. In pertinent part, the agency required that a State plan "[p]rovide[] effective sanctions against employers who violate State standards and orders, such as those prescribed in the [OSH] Act." 29 C.F.R. § 1902.4(c)(2)(xi) (1972). Decades later, through an interim final rule, OSHA added ". . . and in 29 CFR 1903.15(d)" to reference the new location of the OSH Act's penalties, as dictated by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 ("2015 Federal Penalties Act"). *See* Department of Labor Federal Civil Penalties Inflation Adjustment Act Catch-Up Adjustments, 81 Fed. Reg. 43,430, 43,446 (July 1, 2016) (the "2016 IFR").

Plaintiffs brought *McMaster II* more than six years after OSHA promulgated the July 2016 IFR, challenging that IFR under the Administrative Procedure Act ("APA") and asking the Court to declare the meaning of the OSH Act and OSHA's regulations. Defendants moved to dismiss the APA counts as untimely (MTD 13–15) and to dismiss the declaratory-relief counts as either barred by *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994) (MTD 16–23) or for want of cause of action (*id.* at 24). The case was stayed pending the Supreme Court's decision in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. --, 144 S. Ct. 2440 (2024), after which Defendants renewed their motion to dismiss, *see* ECF No. 35.

1

Plaintiffs' opposition to Defendants' renewed motion, while addressed in detail below, is most notable in two respects.

*First*, Plaintiffs ignore the early history of their State plan and OSHA's regulations. That history is critical because, when 29 C.F.R. § 1902.4(c)(2)(xi) was issued in 1971, South Carolina's penalties were but a fraction of the OSH Act's. *See* MTD Background § B ("South Carolina's State Plan and OSHA's Regulations"). Soon after the regulation was promulgated, South Carolina increased its penalties to match the OSH Act. This was no coincidence; it was done specifically "to bring the plan into conformity with the requirements of 29 CFR Part 1902." *Id.* at 6 (citing Advanced Notice of Proposed Supplements to Approved Plan, 40 Fed. Reg. 3,606, 3,606 (Jan. 23, 1975)). The State's legislative amendment was one of several "developmental steps" that were prerequisites to final approval by OSHA. *See id.* (citing Approved State Plans for Enforcement of State Standards: South Carolina; Certification of Completion of Developmental Steps, 41 Fed. Reg. 32,424 (Aug. 3, 1976)). In other words, everyone watching this space in 1973—including South Carolina, specifically—knew that 29 C.F.R. § 1902.4(c)(2)(xi) required State plans to meet or exceed federal penalties. That conclusion was reinforced when the OSH Act's penalties were increased again in 1990, after which South Carolina *again* increased its penalties to match. *See* MTD Background § C.

Plaintiffs' opposition memorandum, ECF No. 36 ("Opp'n") reads as if OSHA first decreed in 2016 that State plans must meet or exceed federal penalty levels. *See, e.g.*, *id.* at 1 ("Then, in a 2016 Interim Final Rule that was supposed to simply increase federal civil penalties, Defendants declared that state plans *must* increase their civil penalties to match the federal ones.") (emphasis in original). That is simply not true. As demonstrated above, South Carolina knows that OSHA's regulations have required *since 1971* that State plans meet or exceed federal penalties. Far from challenging that requirement, South Carolina has twice acquiesced—in 1973 and in 1991—and

increased its penalties to match.

Exposing Plaintiffs' revisionist history undermines their timeliness arguments. One of their equitable-tolling theories presupposes that OSHA has never actually enforced the requirement in § 1902.4(c)(2)(xi) that State plans have penalties at least as high as OSHA's and that OSHA has only recently taken it seriously. *Id.* at 10–12. The foregoing history belies that premise: South Carolina was required, as an express condition of approval, and specifically because of the Part 1902 regulations, to increase its penalties in 1973. Then history repeated itself in 1991. Plaintiffs can hardly claim "inducement" or "trickery," *see id.* at 10, when they have known OSHA's position for decades, and knowingly acceded to it. Plaintiffs' APA claims are untimely.

*Second*, in response to Defendants' *Thunder Basin* arguments, Plaintiffs previously admitted that Congress *can* force them to "bet the farm," at least where the claim falls within 29 U.S.C. § 667(g). *See* Pls. Resp. in Opp'n to Defs. Mot. to Dismiss 16 (June 5, 2023), ECF No. 14 ("1st Opp'n"); *compare* Opp'n 20. (Of course, Defendants never suggested that *Thunder Basin* applies to claims outside the scope of § 667(g)—that is the whole point of the "of a type" analysis and its three factors.) That concession had unraveled Plaintiffs' whole argument—which may be why they retreat from it in their instant brief. But the point remains: the premise of the "meaningful review" inquiry under *Thunder Basin* is that courts presume Congress never means to "foreclose all meaningful judicial review" of a plaintiff's claim, *i.e.*, that no court should read a statute to do so. But Plaintiffs ask the Court to do just that, at least as to the claims that (in their view) fall within § 667(g). Plaintiffs never catalogued which withdrawals of final approval fall under § 667(g) and which don't, let alone rationalized why Congress would make such a distinction—*i.e.*, force some State plans to cease operating during judicial review while letting others avoid that risk entirely.

The answer is that Congress didn't foreclose meaningful review in Section 18(g) as to *any* withdrawals of final approval. To the contrary, the OSH Act provides for notice, an opportunity to

be heard before the agency, and ultimate review in the courts whenever the Secretary finds a failure to comply substantially with any provision of the State plan (or any assurances therein) and initiates withdrawal procedures. 29 U.S.C. §§ 667(f), (g). Plaintiffs' latest position is untenable in light of the OSH Act and *Thunder Basin*'s progeny.

*     *     *

Perhaps recognizing that *McMaster II* has run aground, Plaintiffs ask the Court for a lifeboat: an order under Rule 60(b) setting aside its judgment in *McMaster I* and allowing Plaintiffs to file an amended complaint in that case. Because it has been more than six years since the 2016 IFR, and leave to amend should be denied where amendment would be futile, the critical question is whether Plaintiffs' APA challenges to the 2016 IFR "relate back" to Plaintiffs' claims in *McMaster I* and may thus be considered as if filed on August 8, 2022.

The answer is "no." Plaintiffs' consistent position—and indeed, the central rationale of the Court's decision in *McMaster I*—was that Plaintiffs had *only* challenged the so-called "mandate" in the Civil Penalties Inflation Adjustment Act Annual Adjustments for 2022, 87 Fed. Reg. 2,328, 2,332 (Jan. 14, 2022) (the "2022 Adjustment"). Needless to say, that is a different "conduct, transaction, or occurrence" than the 2016 IFR, promulgated five-and-a-half years earlier. Fed. R. Civ. P. 15(c)(1)(B). The claims do not relate back.

While not necessary to reach that conclusion, it is worth emphasizing the generous (and gratuitous) steps that both the Court and Defendants undertook to raise this issue with Plaintiffs in *McMaster I*. At the December 2022 hearing, the undersigned counsel's primary suggestion was that Plaintiffs file an amended complaint to make clear what they were challenging. *See generally* Ex. 1, Dec. 2, 2022 Hr'g Tr. 27:14–28:7. The Court, too, raised concerns over the timeliness of any claim challenging the 2016 IFR. *Id.* at 69:10–12. In response, Plaintiffs' counsel insisted "we're good there[;] I don't think we need an amended complaint," and that it wasn't "correct"

4

that Plaintiffs "should have challenged the OSH Act or the underlying regulation." *Id.* at 71:8–9; *id.* at 5:23–25. This is the bed that Plaintiffs made for themselves. Their belated motion for leave to file an amended complaint—which they only sought after the Court dismissed their case—should be denied.

The Court should dismiss *McMaster II* and deny the Rule 60(b) motion in *McMaster I*.[1]

## BACKGROUND

Defendants incorporate by reference the Background section in their motion to dismiss, MTD 3–11, and offer four quick points in rebuttal to Plaintiffs' background section.

**1.** Plaintiffs continue to omit key episodes of relevant history. *See* Opp'n 3. Plaintiffs recount that South Carolina received initial approval in 1972 and final approval in 1987, skipping past the part where the State increased its penalties specifically to bring the plan into conformity with the requirements of 29 C.F.R. Part 1902. *See* 40 Fed. Reg. 3,606, 3,606 (Jan. 23, 1975).

**2.** Plaintiffs' background section misconstrues how the regulation at issue works. *See, e.g.*, Opp'n 7 ("At no point during the five-plus years since the 2016 Interim Final Rule became effective did Defendants take any steps to enforce this mandate on the State Plan."). The 2016 IFR did not introduce any mandate; it only added the following italicized words: "Provides effective sanctions against employers who violate State standards and orders, such as those set forth in the [OSH] Act, *and in 29 CFR 1903.15(d)*." 29 C.F.R. § 1902.4(c)(2)(xi) (emphasis added).[2] The mandate itself is to have "effective sanctions," further modified by "such as." *Id.* Those words

---

[1] For the Court's convenience: there are only three arguments in Plaintiffs' Rule 60(b) motion that are not identical to arguments in Plaintiffs' opposition to Defendants' motion to dismiss: (1) that Defendants would not be prejudiced by an amended complaint (R. 60(b) Mot. 3); (2) that Plaintiffs have acted in good faith (*id.* at 3–4); and (3) that the amended complaint "relates back" (*id.* at 4–5). The balance of the motion (*id.* at 5–13) is identical to portions of Plaintiffs' memorandum in opposition to Defendants' motion to dismiss.

[2] The 2016 IFR also changed "prescribed in" to "set forth in."

were all introduced in 1971, and South Carolina knew for 40 years that the regulation required State plans to match OSH Act penalties. The only change in 2016 was that the Department of Labor followed the 2015 Federal Penalties Act by adjusting OSH Act penalties for inflation and began publishing those penalties in the Code of Federal Regulations. Hence the additional CFR citation.

**3.** Plaintiffs are wrong that "[a] finding is the first step OSHA takes if it intends to revoke a state plan's final approval." Opp'n 7 (citing 29 C.F.R. § 1902.47 *et seq.*; Arizona State Plan for Occupational Health and Safety; Proposed Reconsideration and Revocation, 87 Fed. Reg. 23,783 (Apr. 21, 2022)). FAME Report findings rarely lead to revocation or withdrawal, as South Carolina knows well. The State has received findings in every FAME Report since 2016, including several that were carried over because they weren't remedied, and yet OSHA has never proposed to revoke or withdraw its approval of the South Carolina State plan. The regulations that Plaintiffs cite, 29 C.F.R. § 1902.47 *et seq.*, do not mention—let alone require—any "finding" that must be issued before OSHA proposes, via notice in the Federal Register, to revoke its final approval. *See id.* § 1902.49 ("General notice.").

**4.** Defendants disagree with the following assertion: "South Carolina's penalties have remained unchanged since 1991 and remain at the levels in the OSH Act." Opp'n 6. Plaintiffs are correct that, if the Court opens Title 29 of the U.S. Code, it will find the same penalties that were enacted in 1990. But the OSH Act of 1970, as amended in 1990, is not the only relevant legislation. The 2015 Federal Penalties Act was also a statute, and it dictated annual increases to OSH Act penalties according to a precise formula, which left no room for agency discretion or deviation. Thus, in every relevant sense, Congress amended the OSH Act through the 2015 Federal Penalties Act. And the penalties that OSHA publishes annually, pursuant to the 2015 Federal Penalties Act, are best understood as the OSH Act's penalties (as dictated by Congress).

6

This is not semantic quibbling; it is key to understanding why the 2016 IFR effected no substantive legal change. State plans were always required to match OSH Act penalties; the 2016 IFR simply reflected that Congress—not OSHA—chose to increase those penalties and to list them in annual agency publications in the Code of Federal Regulations rather than in the U.S. Code.

## ARGUMENT

### I.    THE COURT SHOULD GRANT DEFENDANTS' MOTION TO DISMISS *MCMASTER II*.

Through their opposition, Plaintiffs have abandoned Count V (challenging the 2016 IFR as violative of Executive Order 13,132) and Count VIII (seeking injunctive relief). And they don't seriously defend Count VII (the claim from *McMaster I*), as explained more fully below. That leaves two categories of claims: two APA challenges to the 2016 IFR (Counts IV and VI) and three pleas for declaratory relief (Counts I–III).

### A.    Plaintiffs' APA Claims (Counts IV and VI) Are Untimely.

In the first round of briefing over Defendants' motion to dismiss, Plaintiffs admitted that their claims were untimely but asked that equitable tolling apply. *See* 1st Opp'n 8–9. In their present opposition, Plaintiffs lead with a new argument: that they suffered no injury from the 2016 interim final rule, and thus could not have brought an APA suit, when that rule was promulgated. Opp'n 9–11 (citing *Corner Post*, 144 S. Ct. at 2448). Defendants will rebut that argument first, before turning to Plaintiffs' equitable-tolling argument.

#### 1.    Plaintiffs' APA claims accrued more than six years before they brought suit.

Because Plaintiffs' primary argument depends entirely on *Corner Post*, it is critically important to understand what that case did (and did not) decide. As the majority opinion recounted, the Court took the case to resolve "a circuit split over when [28 U.S.C.] § 2401(a)'s statute of limitations begins to run for APA suits challenging agency action." *Corner Post*, 144 S. Ct. at 2449. The Court sided with a majority of circuits in holding that "[a]n APA plaintiff does not have

a complete and present cause of action until she suffers an injury from final agency action, so the statute of limitations does not begin to run until she is injured." *Corner Post*, 144 S. Ct. at 2450. Put another way, the Court decided that § 2401(a) "operates as a statute of limitations rather than a statute of repose." *Id.* at 2452.

*Corner Post* did not address, expound, or alter what it means to be "injured in fact" for the purposes of APA § 702. *Id.* at 2459 (quoting *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 127 (1995)). The Court certainly did not hold that a regulated party is not injured until the agency takes "steps to enforce" that rule—a proposition for which Plaintiffs offer no authority. *See* Opp'n 9.[3] To the contrary, the Court in *Corner Post* assumed a rather expansive theory of § 702 harm. *See id.* at 2450 n.2. The petitioner was not even regulated by the agency rule at issue; rather, the petitioner merely had to do business with the "payment network[s]" that were. *Id.* Thus, the Court assumed that Corner Post—a convenience store not subject to the agency rule at issue—suffered a § 702 injury from that rule. And if that is so, then South Carolina—which is directly regulated by the 2016 rule and required by it to take certain steps—certainly suffered such an injury upon the promulgation of that rule.

*Corner Post* also reaffirmed other APA principles, which render Plaintiffs' "injury" argument ultimately self-defeating—namely, that "judicial review is available only for 'final agency action.'" *Corner Post*, 144 S. Ct. at 2450 (quoting 5 U.S.C. § 704).[4] Any alleged injury (for APA § 702 purposes) would have to flow from final agency action—that is, "the consummation of the agency's decisionmaking process . . . by which rights or obligations have

---

[3] Plaintiffs' "*cf.*" cite to a District of Utah case about a constitutional claim against the State's anti-bigamy statute is, to put it mildly, far afield from the question of administrative law presented here. *See* Opp'n 9 (citing *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012)).

[4] That is, of course, "[u]nless another statute makes the agency's action reviewable . . . ." *Id.* The OSH Act *does* provide for review in the courts of appeals of OSHA's withdrawal of a State Plan's final approval—which is why Plaintiffs' declaratory-relief counts fail, *see infra* § B.1.

been determined, or from which legal consequences will flow." *Corner Post*, 144 S. Ct. at 2450 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997)). Plaintiffs' new ostensible source of harm—a finding in the FY2021 FAME Report, *see* Opp'n 9–10—doesn't satisfy either of *Bennett*'s requirements.[5] As explained in the Background rebuttal above, a FAME Report finding neither fixes the agency's position nor determines the rights or obligations of anyone outside the agency.[6] In South Carolina's case, for example, it has now been three years since the FAME Report finding and no revocation has even been proposed. *See* MTD 28. Thus the horns of Plaintiffs' dilemma: either their injury flows from the 2016 amendment, in which case they are too late, or it flows from the FY2021 FAME Report, in which case there is nothing to challenge under the APA. Either way, Counts I–III must be dismissed.

### 2. Plaintiffs' claims should not be equitably tolled.

Even assuming that § 2401(a) is a "claim[s]-processing rule" subject to equitable tolling, Opp'n 11, neither of Plaintiff's tolling theories holds water.

### a) Plaintiffs' "defective complaint" theory fails.

Plaintiffs first argue that they should be excused because they filed a pleading, albeit a defective one, before the statute of limitations ran. *Id.* at 11–13. But the sole cited case, *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89 (1990), is of no help to Plaintiffs. There, the Supreme Court cautioned that "[f]ederal courts have typically extended equitable relief only sparingly." *Id.* at 96.

---

[5] If it did, then Plaintiffs doubtless would have challenged the FAME Report itself under the APA. But as the complaint makes clear, they do not even purport to do so.

[6] Plaintiffs' allusion to the past situation in Arizona, Opp'n 10 n.4, only proves the point. Yes, a FAME Report finding preceded revocation proceedings in that State. But Plaintiffs identify no support—other than their own *ipse dixit*—for their theory that the FAME Report finding was a necessary precursor to revocation; *i.e.*, there is still no legal connection between a FAME Report finding and the revocation of a State plan's final approval. And indeed, Arizona's proposed revocation was later withdrawn, undercutting Plaintiffs' assertion that revocation is certain to follow a FAME Report finding. *See* 88 Fed. Reg. 9,976 (Feb. 15, 2023).

In two of the examples cited by the *Irwin* Court, the plaintiff "timely filed [its] complaint in the wrong court." *Id.* at 96 n.3. In other words, the Plaintiff challenged the right conduct but in the wrong forum. In the third cited case, a "defective class action" tolled the limitations period for individual claims by class members. *Id.* But the class action failed for want of numerosity, as required by Rule 23(a)(1). *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 543 (1974). Again, the plaintiff had challenged the right conduct, but its complaint was "defective" for other reasons.

In no example cited by *Irwin*, or by Plaintiffs here, was the timely complaint "defective" because it failed to challenge entirely separate conduct by the defendant—in this case, a distinct agency action taken five-and-a-half years earlier. And the conclusion in *Irwin* is instructive: the Court denied equitable relief because it was "at best a garden variety claim of excusable neglect."

Plaintiffs accuse Defendants of "ignor[ing] the fact that Plaintiffs explicitly and repeatedly said they were challenging the 'mandate' in that Adjustment, not the mathematical calculation of the increase in the penalties." Opp'n 11. Defendants have not ignored that fact; to the contrary, it proves the point. Plaintiffs challenged the "mandate" *in the 2022 Adjustment*, not any part of the 2016 IFR. And while Plaintiffs did say they were "happy to challenge" the 2016 IFR "*if* that was 'where [the Court] conclude[d]' Plaintiffs' claims need to lie," *id.* (quoting Ex. 1, Dec. 2, 2022, Hr'g Tr. at 13), that again proves the point. Expressing willingness to challenge the 2016 IFR in "the alternative" (*id.*) only confirms that Plaintiffs didn't challenge it in the first place.

One final point on this score, since Plaintiffs rely so heavily on the December 2022 hearing. When undersigned counsel took the lectern, his first suggestion was that Plaintiffs file an amended complaint so that all involved would know what Plaintiffs were, and weren't, challenging. *See generally* Ex. 1, Dec. 2, 2022, Hr'g Tr. 27:14–28:7. The Court later said it was "trying to figure out[] if [Plaintiffs] had challenged" the 2016 IFR. *Id.* at 69:10–12. Plaintiff's counsel was steadfast: "I think we're good there. I don't think we need an amended complaint." *Id.* at 71:8–9. That echoed

his prior insistence that Plaintiffs had "challenged the right thing," namely the 2022 Adjustment and *not* "the OSH Act itself or Section 1902.4(c)(2)(xi)." *See generally id.* at 5:7–22; *see also id.* at 5:23–25 ("Now, the federal government has suggested we should have challenged the OSH Act or the underlying regulation, but I don't think that's correct.").

Plaintiffs did not file in the wrong court, name the wrong agency, or cite the wrong statute. They consciously chose *not* to challenge the 2016 IFR and refused to add such claims even after Defendants invited them to. That "neglect," even if it were excusable, does not warrant equitable tolling. *Irwin*, 498 U.S. at 96.

### 3. Plaintiffs were not "induced," "tricked," or "lulled."

There is no evidence that Defendants "induced," "tricked," or "lulled" the State of South Carolina into sitting on its rights. Opp'n 14–15 (quoting *Irwin*, 498 U.S. at 96 and *Weick v. O'Keefe*, 26 F.3d 467, 470 (4th Cir. 1994)).[7] To the contrary, in response to comments raising the same claims that Plaintiffs press here, OSHA stated its position clearly and publicly more than six years before Plaintiffs filed this suit. *See* MTD 13–14 (citing Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2017, 82 Fed. Reg. 5,373, 5,376 (Jan. 13, 2017)). OSHA has explicitly informed the State plans of the same every year since then in its annual adjustments. OSHA has also exhorted South Carolina in every FAME Report since 2016 to increase its penalties, reiterating that this was required by 29 C.F.R. § 1902.4(c)(2)(xi). *See generally id.* Background § D. And of course, this all followed a decades-long history under these regulations, in which OSHA laid bare its interpretation of these regulations as early as 1971, informed South Carolina as early as 1972 that meeting or exceeding federal penalties was a condition of the State plan's final approval, and in which South Carolina amended its laws

---

[7] That is a particularly audacious argument, given that Defendants specifically invited Plaintiffs to amend their complaint last December, less than six years after the 2017 "Final Rule" (in which the Department responded to comments on the 2016 IFR). Ex. 1, Dec. 2, 2022, Hr'g Tr. 27:14–28:7.

specifically to conform with OSHA's interpretation. *See id.* at 5–8. That history confirms that Plaintiffs have known Defendants' interpretation for more than 50 years and never challenged it.

In short, OSHA has been up to no tricks. The agency has been above board with every State Plan since 1971, and explicitly clear with South Carolina since 1972, about the meaning of its regulations. Plaintiffs' accusations to the contrary are baseless.

## B.    Plaintiffs' Declaratory-Relief Claims (Counts I–III) Should Be Dismissed.

### 1.    These claims are barred by *Thunder Basin*.

As Defendants noted in their opening motion, MTD 21 n.19, they are unaware of any court's having ruled on whether Section 18(g) of the OSH Act divests district courts of jurisdiction. But courts *have* held that other parts of the OSH Act divest district-court jurisdiction. *See id.*. Thus, the only question is whether Congress intended something else for Section 18(g).

#### a)    There is a "fairly discernible intent" in the OSH Act to preclude district-court jurisdiction.

Plaintiffs appear to argue that, because the Mine Act and Civil Service Reform Act are more "elaborate" than the OSH Act, *Thunder Basin* and *Elgin* are inapposite. Opp'n 17. But *Thunder Basin* only requires a "fairly discernible" intent to "allocate[] initial review to an administrative body." *Thunder Basin*, 510 U.S. at 207. As the Supreme Court put it most recently, Congress need only "specify[] a different method to resolve claims about agency action." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). One tried-and-true method is "review in a court of appeals following the agency's own review process," *id.*, which is exactly what Section 18(g) of the OSH Act provides: "The State may obtain a review of a decision of the Secretary withdrawing approval of . . . its plan by the United States court of appeals for the circuit

in which the State is located." 29 U.S.C. § 667(g).[8] The answer to *Thunder Basin*'s first question is "yes."

> **b)**     **Plaintiffs' claims are "of the type" that Congress meant to await *post hoc* review.**

The Court must apply three *Thunder Basin* factors to determine whether a plaintiff's claim is the type that Congress meant to channel exclusively to *post hoc* review in circuit court: (1) whether precluding district-court jurisdiction would "foreclose all meaningful judicial review" of the plaintiff's claims; (2) whether those claims are "wholly collateral to [the] statute's review provisions"; and (3) whether the claims are "outside the agency's expertise." *Axon Enter.*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212–13).

Plaintiffs' primary argument is that, because Section 18(g) of the OSH Act provides for "substantial evidence" review, it doesn't encompass "[q]uestions of law involving the scope of agency authority[.]" Opp'n 18–19. As an initial matter, Plaintiffs are wrong that "substantial evidence" review keeps courts from reaching legal questions. OSHA has witnessed this firsthand, with respect to the OSH Act specifically. *See, e.g.*, *Indus. Union Dep't v. Am. Petroleum Institute*, 448 U.S. 607, 514–15 (1980) (affirming the Fifth Circuit's rejection of OSHA's method for evaluating the need for rulemaking) ("We agree with the Fifth Circuit's holding that [OSH Act] § 3(8) requires the Secretary to find, as a threshold matter, that the toxic substance in question poses a significant health risk in the workplace and that a new, lower standard is therefore 'reasonably necessary or appropriate to provide safe or healthful employment and places of employment'"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981) (affirming the D.C.

---

[8] It is evident, then, that the OSH Act does not put a "lock on the courthouse door," Opp'n 12, or "allocate all claims to an administrative body," *id.* at 13. To the contrary, Congress was careful to preserve judicial review; that review merely follows administrative action and takes place in the court of appeals—as it does under numerous other federal statutes. *See, e.g.*, *Axon Enter.*, 598 U.S. at 181 (discussing the Securities Exchange Act and Federal Trade Commission Act).

Circuit's determination that satisfying the "substantial evidence" standard in the OSH Act does not require OSHA to conduct cost-benefit analysis); *Nat'l Fed'n Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661 (2022) (finding that the OSH Act "empowers the Secretary to set *workplace* safety standards, not broad public health measures" and reversing the Sixth Circuit in reinstating a stay of OSHA's COVID-19 vaccination and testing ETS on the basis that petitioners were likely to succeed on their claim that the rule exceeded the Secretary's statutory authority under the OSH Act).

Furthermore, Plaintiffs' proposed distinction between "evidentiary" and "legal" claims finds no basis in the OSH Act's text or structure. Section 18 vests approval of a proposed State plan within the Secretary of Labor's "judgment." 29 U.S.C. § 667(c). That judgment is exercised to determine whether State plans satisfy eight different criteria, *id.* §§ 667(c)(1)–(8). Those criteria are not divided into "evidentiary" criteria and "legal" criteria. And indeed, a State plan might fail to satisfy several of those criteria based on the State's laws alone. For example, the first criterion is merely whether the State "designates a State agency or agencies as the agency or agencies responsible for administering the plan throughout the State." 29 U.S.C. § 667(c)(1). The third criterion is whether the State "provides for a right of entry and inspection of all workplaces," and "includes a prohibition on advance notice of inspections." 29 U.S.C. § 667(c)(3). Determining whether State statutes satisfy those criteria is not inherently "evidentiary-related," Opp'n 18, and neither is assessing whether the State meets or exceeds federal penalties.

It is simply not plausible, moreover, to think that Congress meant for some of the Section 18(c) criteria to be judicially reviewable under Section 18(g) and some not. The statute makes no such distinction and, tellingly, Plaintiffs never delineate which criteria fall into each category. But it is even *less* plausible to think that Congress would expressly provide for judicial review of the "evidentiary" criteria in circuit court, through Section 18(g), while *implicitly* vesting review of the

14

"legal" criteria in district court.[9] Especially given that Congress expressly vested other causes of action in district court, *see* MTD 20–21, one must think Congress would have done the same here. It didn't. The best reading of Section 18(g) is that it offers judicial review of the Secretary's decision to withdraw final approval for failure to satisfy any of the Section 18(c) criteria—including whether a State plan enforces its standards at least as effectively as OSHA does.

Turning to the three *Thunder Basin* factors, they all favor exclusive jurisdiction in the Court of Appeals.

### c)    Meaningful review.

The Parties agree that, under *Thunder Basin*, a putative plaintiff might not receive "meaningful review" in circuit court if, in the meantime, it is "subject to 'some additional *and irremediable* harm beyond the burdens associated with the dispute resolutions process.'" *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th Cir. 2018) (quoting *Bennett*, 844 F.3d at 186 n.13 (emphasis added)). In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 490 (2010), the Supreme Court observed that putative plaintiffs are not normally required to "bet the farm," a term originating in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007), and referring to the prospect of criminal prosecution in *Terrace v. Thompson*, 263 U.S. 197 (1923).

While accusing Defendants of "miss[ing] the mark," Opp'n 19, Plaintiffs never meaningfully rebut the binding precedent on which Defendants rely: *MedImmune*'s cataloguing of

---

[9] That inference would be particularly unwarranted, given that Section 18(g) provides judicial review over *rejections* (of State plans submitted for approval) as well as withdrawals. *See* 29 U.S.C. 667(g). In other words, Congress directed disappointed State applicants to circuit court for "substantial evidence" review even when there was not yet any "record" (Opp'n 14) of the State's performance. This is yet another way in which Plaintiffs' reading of "substantial evidence" cannot be squared with the OSH Act.

Supreme Court cases, all of which referred to criminal prosecution (*see* MTD 19–20)[10]; the comparative irreparability of the harms catalogued by the Fourth Circuit in *Berkley*, 896 F.3d at 624 (*see* MTD 20 n.17 (collecting cases)); and three Fourth Circuit cases finding "meaningful review" under *Thunder Basin* even where the plaintiff argued that it suffered some harm beyond the cost of litigation (*see* MTD at 20–21 (citing *Berkley*, 896 F.3d at 627–28, 631–32; *Scottsdale Cap. Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.*, 844 F.3d 414, 423 (4th Cir. 2016); *Bennett*, 844 F.3d at 186 & n.13 (emphasis added)).

The primary drum that Plaintiffs beat, *Free Enterprise Fund*, remains easily distinguishable. There, the Supreme Court held that it would be "bet[ting] the farm" to incur "a sizable fine" for refusing to cooperate with a Public Company Accounting Oversight Board (PCAOB) investigation. *Free Enter. Fund*, 561 U.S. at 490. Plaintiffs cite no case in which the potential temporary suspension of a discretionary government program was deemed a "sanction," nor do they identify a case where alleged "uncertainty," "confusion," or the "*potential*[] displace[ment of] state employees" (Opp'n 20) (emphasis added) were found to be "irremediable harm[s]," *Berkley*, 896 F.3d at 631. Nor do Plaintiffs account for the many procedural protections in place for State plans facing withdrawal of its final approval. *See generally* 29 C.F.R. Part 1955.

In their prior opposition, Plaintiffs admitted that Congress *can* make them undergo this so-called "chaos," provided that the claims at issue "undoubtedly fall[] under § 667(f) and § 667(g)." 1st Opp'n 16. In other words, Plaintiffs agreed that for any claim covered by the judicial-review provision in § 667(g), they *are* required (by Congress) to "bet the farm." That concession was

---

[10] In their present opposition, and with the benefit of a nine-month stay pending *Corner Post*, Plaintiffs have found but two examples—neither from the Supreme Court or the Fourth Circuit— in which "bet the farm" did not refer to criminal prosecution. Opp'n 20 (citing *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 427 (5th Cir. 2024); *Consumers' Rsch. v. Fed. Commc'ns Comm'n*, 67 F.4th 773, 786 (6th Cir. 2023)). If anything, these are the proverbial exceptions that prove the rule.

notable for several reasons. First, Plaintiffs conceded that it would be constitutional for Congress to force a State plan to cease before seeking judicial review, *i.e.* that "that's a choice Congress gets to make." 1st Opp'n 16. Second, the concession left a marked contradiction among Plaintiff's arguments. They were left arguing that, in fact, Congress *did* intend to foreclose all meaningful review—at least for those State plans with "evidentiary" claims, which even Plaintiffs agree must await circuit-court review. But under *Thunder Basin*, we assume that is never Congress' intent.

While Plaintiffs never rationalized this disparate treatment—forcing States with "evidence-based" claims to bet the farm, while allowing States with "legal claims" to avoid any risk whatsoever—the best explanation was always that Section 18(g) does not, in fact, "foreclose all meaningful judicial review" or require any State plan to "bet the farm." Plaintiffs' untenable contradictions were telling, to say the least. It is even more telling, therefore, that Plaintiffs have now changed their tune. *Compare* 1st Opp'n 16 *with* Opp'n 19–21 (dropping such argument). Given clear Supreme Court caselaw on what it means to "bet the farm," and Plaintiffs' shifting attempts to shoehorn their situation into the well-understood definition of that term, the Court should have little trouble concluding that Plaintiffs may still obtain "meaningful review" under *Thunder Basin* by simply challenging any withdrawal of their State plan in circuit court, as the OSH Act intends.

Finally, Plaintiffs have also dropped their argument that, as a "practical reality," their declaratory-relief claims (Counts I–III) will necessarily be teed up by their APA claims (Counts IV and VI). *Compare* 1st Opp'n 17 *with* Opp'n 19–21. Without rehashing this evidently conceded point, Plaintiffs' argument was wrong for reasons previously expressed. *See* Defs. Combined Reply & Opp'n to Cross Mot. 15–16 (June 20, 2023).

**d)       Collaterality.**

Plaintiffs misunderstand the collaterality inquiry under *Thunder Basin*. *See* Opp'n 21. The

question is whether the plaintiff's claims are collateral "*to [the] statute's review provisions*." *Free Enter. Fund*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212–13 (emphasis added)). Thus, while the plaintiffs in *Free Enterprise Fund* could have raised their structural-constitutional claims before the PCAOB, as Plaintiffs suggest, those claims would remain collateral to "Commission orders or rules," of which the Securities Exchange Act provided review. 15 U.S.C. § 78y. The opposite is true here. Plaintiffs' claim is that OSHA has no legal basis for withdrawing approval of South Carolina's State plan. Far from collateral, that is exactly what the "statute's review provision[]," *Free Enter. Fund*, 561 U.S. at 489, encompasses: "The State may obtain a review of a decision of the Secretary withdrawing approval of or rejecting its plan by the United States court of appeals for the circuit in which the State is located[.]" 29 U.S.C. § 667(g).

### e)    Agency expertise.

Plaintiffs deny that OSHA is expert on its own regulations or the statute it has administered for more than 50 years. Opp'n 21–22. Contrary to Plaintiff's argument, however, OSHA's "expertise" under *Thunder Basin* is not limited to "exposure limits" and "safety gear." *Id.* at 21, 22. The OSH Act itself vests in the Secretary of Labor's "judgment" the question whether a State plan complies with the Section 18(c) criteria. 29 U.S.C. § 667(c); *see also id.* § 667(e) ("The Secretary may exercise the authority referred to above until *he determines* . . . that criteria set forth in subsection (c) are being applied"); *id.* § 667(f) ("The Secretary shall, on the basis of reports submitted by the State agency and *his own inspections* make a continuing evaluation" of the State plan and take action to withdraw a State plan if "the *Secretary finds*, after affording due notice and opportunity for a hearing, that . . . there is a failure to comply substantially with any provision of the State plan") (emphasis added).

In *Thunder Basin*, the Supreme Court reasoned that "Petitioner's statutory claims at root require interpretation of the parties' rights and duties under § 813(f) and 30 CFR pt. 40, and as

such arise under the Mine Act and fall squarely within the Commission's expertise." 510 U.S. 200 at 214; *cf. id.* at 214–15 ("Although the Commission has no particular expertise in construing statutes other than the Mine Act, we conclude that exclusive review before the Commission is appropriate since 'agency expertise [could] be brought to bear on" the statutory questions presented here.'" (quoting *Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 420 (1965))). Likewise in *Elgin*, the Court reasoned that "the challenged statute may be one that the MSPB regularly construes" or "routinely considers," such that the agency's expertise could be "brought to bear." *Elgin v. U.S. Dep't of Treasury*, 567 U.S. 1, 23 (2012). Plaintiffs overlook this precedent, instead relying on a smattering of concurring and dissenting opinions from other contexts. Opp'n 18–19. Just as in *Thunder Basin* and *Elgin*, the Court is being asked to interpret statutes and regulations that are squarely within OSHA's expertise.

Finally, Plaintiffs' invocation of *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) is misguided. Opp'n 22. Under *Thunder Basin*, an agency's expertise is not a reason to *defer* to the agency's interpretation of the statute(s) it administers, but rather a reason why Congress would let the agency's adjudication play out before the legal question(s) may be considered in an Article III forum. And despite overruling *Chevron*, the Court in *Loper Bright* recognized that "exercising independent judgment often include[s] according due respect to Executive Branch interpretations of federal statutes." 144 S. Ct. at 2257. Defendants have never suggested that any court would owe *Chevron* deference to Defendants' interpretation of the OSH Act, but in any case, the overruling of that doctrine is irrelevant to the *Thunder Basin* analysis.

### 2.     Counts I–III are not "actionable under the APA."

Plaintiffs argue that Counts I–III are brought, not "solely" under the Declaratory Judgment Act, but also under the APA. Opp'n 19–20. But the complaint doesn't say that, and that is not a plausible reading of Counts I–III.

For starters, if Counts I–III are APA challenges, then the Court must first ask: challenges *to what*? Count I merely asks the Court to declare the meaning of a statute, which is obviously not "agency action." 5 U.S.C. § 551(13). Indeed, none of Counts I–III addresses any agency action whatsoever; they simply ask the Court to opine on one statute and two regulations. Accordingly, it would make no sense to construe them as brought under the APA. If instead, Plaintiffs mean to suggest that Counts II and III are challenges to the *promulgation of* the terms "effective" or "such as" in 29 C.F.R. § 1902.4(c)(2)(xi), then Plaintiffs are woefully out of time. Those terms were introduced more than fifty years ago, and Plaintiffs nowhere suggest that these "APA claims" have been equitably tolled since 1971. Finally, it bears noting that where Plaintiffs actually sought declaratory relief under the APA, they said so. *See, e.g.*, Compl. ¶¶ 64–73 (Count IV) ("Declaratory Judgment – Violation of 5 U.S.C. § 706(2)(A)"). Counts I–III, by contrast, do not even mention the APA.

Counts I–III cannot be taken seriously as APA claims, which leaves two options. First, the Court could conceive of them as prayers for relief, meant to attend Plaintiffs' *actual* APA claims (Counts IV and VI). (That seems to be the unspoken thesis of Plaintiffs' erstwhile "practical reality" argument, *see* 1st Opp'n 17.) In that case, the Court should dismiss Counts I–III because they are not true claims. Alternatively, the Court could take Counts I–III as they appear: stand-alone claims under the Declaratory Judgment Act. In that case, they fail under *Thunder Basin* (MTD 19–26) and because Declaratory-Judgment-Act claims cannot be brought in a vacuum (*id.* at 27), which Plaintiffs do not attempt to rebut (Opp'n 22–24). In either case, Counts I–III should be dismissed.

### C.     The Claim from *McMaster I* (Count VII) Should Be Dismissed.

Defendants pointed out that Count VII is the same claim that the Court dismissed in *McMaster I*, and that Plaintiffs had offered no reason for the Court to reconsider its analysis. MTD

13. Plaintiffs don't deny that, and they still don't offer any reason for the Court to change its mind. Opp'n 24. To the contrary, Plaintiffs admit that Count VII is "unnecessary" so long as Defendants can no longer "use" the annual adjustments if the 2016 IFR is found to be invalid. Opp'n 24. But Defendants need not concede this point, nor must the Court entertain it. *Id.* The annual inflation-based adjustments simply are not "agency action," as the Court has already ruled. *See McMaster I* at 9. Count VII should be dismissed—again.

## II. THE COURT SHOULD DENY PLAINTIFFS' RULE 60(B) MOTION IN *McMASTER I* BECAUSE THEIR PROPOSED AMENDED COMPLAINT WOULD BE FUTILE.

Plaintiffs are correct that, under Fourth Circuit precedent, their Rule 60(b) motion, ECF No. 59 ("R. 60(b) Mot."), should effectively be treated as a motion for leave to file an amended complaint under Rule 15. *See Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 470–71 (4th Cir. 2011). To defeat the motion, Defendants need not claim prejudice—although that is self-evident where a defendant would have to face litigation that is otherwise time-barred—or that Plaintiffs have acted in bad faith. It suffices that Plaintiffs' proposed amended complaint would be futile. The key question is whether Plaintiffs APA claims challenging the 2016 IFR "relate back" to the original pleading in *McMaster I*. If so, then Plaintiffs' APA claims would be treated as if filed in August 2022.

Under Rule 15, an amended complaint will relate back whenever "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" Fed. R. Civ. P. 15(c)(1)(B). But the dispositive, indisputable fact is that Plaintiffs are challenging *different* conduct, transactions, and occurrences in *McMaster II* than they did in *McMaster I*. Much of this has been covered above, in response to Plaintiffs' equitable-tolling arguments. At the risk of repeating themselves, Defendants will merely summarize: in *McMaster I*, Plaintiffs challenged the 2022 Adjustment and nothing else. Now, in *McMaster II*, they want to challenge the 2016 IFR—something that Defendants invited them to do

in *McMaster I*, but they refused. *See* Argument § I.A.2., *supra*.

While calling this a "classic case of relating back," R. 60(b) Mot. 5, Plaintiffs pointedly depart from the legal standard. The question is not whether their two complaints are "based on the same underlying *legal theory*," R. 60(b) Mot. 5 (emphasis added), but rather whether they arise out of the same "conduct, transaction, or occurrence," Fed. R. Civ. P. 15(c)(1)(B)—or as Plaintiffs' own cases put it, whether there is a "*factual* nexus between the amendment and the original complaint." R. 60(b) Mot. 4 (quoting *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir. 1983) (emphasis added)). There is no factual nexus here; the pleadings relate to entirely separate conduct: the 2016 IFR and the 2022 annual adjustment. Plaintiffs' proposed amended complaint does not relate back, therefore, and their Rule 60(b) motion should be denied as futile.

Dated:  October 11, 2024                    Respectfully submitted,
                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            JULIE STRAUS HARRIS
                                            Assistant Branch Director

                                            /s/ *Jason C. Lynch*
                                            JASON C. LYNCH (D.C. Bar No. 1016319)
                                            Trial Attorney
                                            Federal Programs Branch
                                            U.S. Department of Justice, Civil Division
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Telephone: (202) 514-1359
                                            Email: Jason.Lynch@usdoj.gov

                                            *Counsel for Defendants*